# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| IN RE DIRECT GENERAL, INC., | ) | **Consolidated Civil Action** |
| DERIVATIVE LITIGATION | ) | **No. 3:05-0158** |
|  | ) | **Judge Todd Campbell** |
|  | ) |  |

---

## VERIFIED AMENDED SHAREHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

---

Plaintiff, by his attorneys, submits this Verified Amended Shareholder Class and Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.    This is a shareholder derivative action brought pursuant to Tennessee Annotated Code '48-17-401 and Tennessee Rule of Civil Procedure 23.06 by a shareholder of Direct General Corporation ("Direct" or the "Company"),  on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between November 2003 and the present (the "Relevant Period") and that have caused substantial losses to Direct and other damages, such as to its reputation and goodwill.

2.    This action is also being brought by shareholders of the Company on behalf of all shareholders of the Company pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, and pursuant to state law, seeking injunctive relief and monetary damages against certain officers of the Company and members of its Board of Directors (the "Board") in connection with the formulation and approval of a proposed

acquisition of Direct (the "Merger") by the Merger Group (as defined below), designed to extinguish the Individual Defendants' personal liability stemming from their breaches of fiduciary duty, abuse of control, gross mismanagement and waste of corporate assets.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to the Exchange Act (15 U.S.C. '78aa), 28 U.S.C. '1331, and 28 U.S.C. '1332(a)(1) and because complete diversity exists between the plaintiffs and defendants, and the matter in controversy exceeds $75,000, exclusive of interests and costs.

4.      This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

5.      Venue is proper in this Court because nominal defendant Direct is headquartered in this district and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.

6.      One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

7.      Plaintiff Ronald Green, a resident and citizen of the state of Florida, is, and was at times relevant hereto, an owner and holder of Direct common stock.

8.      Plaintiff Lynn Schwartz, a resident and citizen of the state of Florida, is, and was at times relevant hereto, an owner and holder of Direct common stock.

9.      Nominal defendant Direct is a corporation organized and existing under the laws of

the state of Tennessee with its headquarters located at 1281 Murfreesboro Road, Nashville, Tennessee. Direct is a financial services holding company whose principal operating subsidiaries provide non-standard personal automobile insurance, term life insurance, premium finance and other consumer products and services through neighborhood sales offices staffed primarily by employee-agents.

10.     Defendant William C. Adair, Jr. ("W. Adair"), a resident and citizen of the state of Tennessee, is, and at all times relevant hereto was, Chairman, President, Chief Executive Officer ("CEO") and a director of Direct. Because of W. Adair's positions, he knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, W. Adair participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:03, Direct paid defendant W. Adair $726,934 in salary, bonus and other compensation, and granted him 300,000 options to purchase Direct stock.

11.     Defendant Jacqueline C. Adair ("J. Adair"), a resident and citizen of the state of Tennessee, is, and at all times relevant hereto was, Executive Vice President, Chief Operating Officer and a director of Direct. Because of J. Adair's positions, she knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings

and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, J. Adair participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Direct paid defendant J. Adair $359,503, in salary, bonus and other compensation, and granted her 240,000, options to purchase Direct stock. During the Relevant Period, J. Adair sold 180,000 shares of Direct stock for proceeds of $5,979,800.

12. Defendant Tammy R. Adair ("T. Adair"), a resident and citizen of the state of Tennessee, is President, and at times relevant hereto was, Executive Vice President of Direct. Because of T. Adair's position, she knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. During the Relevant Period, T. Adair participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Direct paid defendant T. Adair $272,906, in salary, bonus and other compensation, and granted her 90,000 options to purchase Direct stock, respectively. During the Relevant Period, T. Adair sold 2,049,431 shares of Direct stock for proceeds of $68,526,211.75.

13. Defendant Barry D. Elkins ("Elkins"), a resident and citizen of the state of Tennessee, is, and at all times relevant hereto was, Senior Vice President and Chief Financial Officer of Direct. Because of Elkins' position, he knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to

him in connection therewith. During the Relevant Period, Elkins participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Direct paid defendant Elkins $252,575, in salary, bonus and other compensation, and granted him 30,000 options to purchase Direct stock, respectively. During the Relevant Period, Elkins sold 144,000 shares of Direct stock for proceeds of $4,932,000.

14.     Defendant William J. Harter, a resident and citizen of the state of Tennessee, is, and at all times relevant hereto was, Senior Vice President, Corporate Development, Banking and Finance, since February, 2003. Because of Harter's position, he knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Defendant Harter also acts the Investor Relations contact for the Company, and is responsible in part for the issuance of false and misleading public statements during the Relevant Period, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Direct paid defendant Harter $210,000 in salary, bonus and other compensation, and granted him 18,000 options to purchase Direct stock. During the Relevant Period, defendant Harter participated in the Company's shelf-registration offering of March 23, 2004, disposing of 12,000 worth of personally-held Company shares for proceeds of $420,480.00, and exercised 96,000 stock options worth $1,414,160.00.

15.     Defendant Ronald F. Wilson ("Wilson"), a resident and citizen of the state of Tennessee, is, and at all times relevant hereto was, General Counsel and Secretary of Direct. Because of Wilson's position, he knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Wilson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Wilson sold 28,000 shares of Direct stock for proceeds of $876,820.00.

16. Defendant Fred H. Medling ("Medling"), a resident and citizen of the state of Tennessee, is, and at all times relevant hereto was, a director of Direct. Because of Medling's position, he knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Medling participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

17. Defendant Raymond L. Osterhout ("Osterhout"), a resident and citizen of the state of New York, is, and at all times relevant hereto was, a director of Direct. Because of Osterhour's position, he knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Osterhout participated in the issuance of false and/or misleading statements, including the preparation of the false and/or

misleading press releases and SEC filings. During the Relevant Period, Osterhout sold 32,241 shares of Direct stock for proceeds of $1,011,488.56.

18.     Defendant Stephen L. Rohde ("Rohde"), a resident and citizen of the state of Minnesota, is, and at all times relevant hereto was, a director of Direct. Because of Rohde's position, he knew the adverse non-public information about the business of Direct, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Rohde participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

19.     The defendants identified in ¶¶9-10, 15-17 are referred to herein as the "Director Defendants." The defendants identified in ¶¶9-12, 14 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶10-14, 16 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on his own behalf and as a class action on behalf of all holders of Direct common stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

21.     This action is properly maintainable as a class action.

22.     The Class is so numerous that joinder of all members is impracticable. According to

Direct's most recent SEC filings, there are nearly 20.35 million shares of Direct common stock outstanding. The actual number of public shareholders of Direct will be ascertained through discovery.

23. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include the following:

(a) whether defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiffs and the other members of the Class in connection with the Merger;

(b) whether the Director Defendants are engaging in self-dealing in connection with the Merger;

(c) whether the Director Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Merger;

(d) whether the Director Defendants are unjustly enriching themselves and other insiders or affiliates of Direct;

(e) whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Merger, including the duties of good faith, diligence, honesty and fair dealing;

(f) whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(g) whether the Director Defendants have acted by fraudulent and deceptive means in connection with the vote to approve the Merger;

(h) whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated; and

(i) whether the Merger Proxy Statement (as define below) is false and misleading under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

24. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

25. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

26. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

27. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

28. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole

### DUTIES OF THE INDIVIDUAL DEFENDANTS

29. By reason of their positions as officers, directors and/or fiduciaries of Direct and because of their ability to control the business and corporate affairs of Direct, the Individual Defendants owed Direct and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Direct in a fair,

just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Direct and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to Direct and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Direct, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Direct, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Direct.

32.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Direct, and was at all times acting within the course and scope of such agency.

33.     To discharge their duties, the officers and directors of Direct were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Direct were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how Direct conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

34.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the

{003809\05169\00092507.DOC / Ver.1} 11

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Direct, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Direct's Board during the Relevant Period.

35. The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Direct has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b) Costs incurred in investigating and defending Direct and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

36. Moreover, these actions have irreparably damaged Direct's corporate image and goodwill. For at least the foreseeable future, Direct will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Direct's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

38.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Direct and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of Direct, regarding the Individual Defendants' management of Direct's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

39.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least November 2003 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Direct was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Direct's financial performance and future business prospects, as alleged herein.

40.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise,

and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Direct common stock so they could: (i) dispose of over $81.7 million worth of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) use the artificially inflated Company stock to complete a secondary offering at $34.25 per share.

41.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### IMPROPER STATEMENTS

43.     On November 4, 2003, the Individual Defendants caused the Company to issue a press release entitled "Direct General Corporation Announces Third Quarter Results." Direct reported "loss and loss adjustment expense reserves" of $105.7 million. The press release stated, in

pertinent part, as follows:

"We are very pleased with our continued growth in the third quarter," stated William C. Adair, Jr., Direct's Chairman of the Board, Chief Executive Officer and President. *"Our earnings performance in the third quarter demonstrates our continued focus on growth that is controlled by strong in-house claims management and disciplined policy pricing. We also continue to benefit from our mostly fixed cost sales distribution network."*

44.     On November 13, 2003, the Individual Defendants caused Direct to file with the SEC its Quarterly Report on Form 10-Q for Q3:03, which reiterated the financial and operational statements in the November 4, 2003 press release and disclosed that it wrote premiums of $53.3 million (out of a total of $103.7 million in premiums), or more than 50% of the total premiums for the third quarter.

45.     Specifically, the Form 10-Q noted increased losses and claims in Miami, Florida, but attributed such increases to higher incidences of fraud:

As mentioned above, increases in average earned premiums, primarily related to growth in new business, has offset increases in claims frequency resulting from other than weather related increases resulting in an overall relatively flat loss ratio. Our recent studies noted that our markets in and around Miami, Florida, which represent approximately 5.0% of our gross written premiums in Florida, have experienced a significant increase in claims frequency on personal injury protection and bodily injury coverages. *We believe that the increased claims frequency is driven by higher levels of fraud activity. We increased rates for personal injury protection coverages in October 2003 and increased the involvement of our special investigation fraud unit in the Miami markets. We will continue to closely monitor these trends and may take additional rate and underwriting actions if warranted.*

46.     The Form 10-Q also included the following Certification signed by defendants W. Adair and Elkins:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the

{003809\05169\00092507.DOC / Ver.1} 15

periods presented in this report....

47.     On February 10, 2004, the Individual Defendants caused the Company to issue a

press release entitled "Direct General Corporation Announces Fourth Quarter Results." The press

release reported "loss and loss adjustment expense reserves" of $112.6 million. The press release

stated, in pertinent part, as follows:

> Direct General Corporation today announced fourth quarter 2003 net income of
> $11.4 million or $0.51 per share, on a diluted basis. The impact of loss reserve
> development and net realized losses on investments decreased net income by
> approximately $0.3 million or $0.01 per diluted share in the current quarter.
> Comparatively, net income for the fourth quarter of 2002 was $13.6 million, which
> included, net of tax, a gain on the commutation of obligations of one of its reinsurers
> and favorable reserve development totaling approximately $3.2 million and net
> realized gains on investments of $0.7 million.
>
> "Our results for the fourth quarter of 2003 continued to reflect strong premium
> growth, controlled loss experience, and the benefits of our sales distribution network.
> Overall, we are very pleased with our accomplishments in 2003," stated William
> Adair, Direct's Chairman, Chief Executive Officer and President.

48.     On March 9, 2004, the Individual Defendants caused Direct to file with the SEC its

Annual Report on Form 10-K for FY:03. The Form 10-K reiterated the financial and operational

statements in the February 10, 2004 press release and disclosed that the Company wrote premiums

of $223.5 million (out of a total of $435.2 million in premiums), or more than 50% of the total

premiums for the year.

49.     The following disclosures were made in the Form 10-K with respect to Direct's

accounting and controls with respect to "Loss and Loss Adjustment Expense Reserves":

> Automobile accidents generally result in insurance companies paying amounts to
> individuals or companies resulting from physical damage to an automobile or other
> property and an injury to a person. Months and sometimes years may elapse between
> the occurrence of an accident, reporting of the accident to the insurer and payment of
> the claim. Insurers record a liability for estimates of losses that will be paid for
> accidents reported to it, which we refer to as case reserves. In addition, since
> accidents are not always reported promptly upon the occurrence, insurers estimate
> liabilities for accidents that have occurred but have not been reported to the insurer,

w

hich we refer to as incurred but not reported or IBNR reserves.

We are directly liable for loss and loss adjustment expenses under the terms of the insurance policies underwritten by our insurance subsidiaries. Each of our insurance subsidiaries establishes a reserve for all unpaid losses and loss adjustment expenses, which we occasionally refer to as LAE, including case and IBNR reserves and estimates for the cost to settle the claims. We rely primarily on historical loss experience in determining reserve levels, on the assumption that historical loss experience provides a good indication of future loss experience. We also give consideration to various factors, such as inflation, historical claims, settlement patterns, legislative activity and litigation trends. We continually monitor these estimates and, if necessary, increase or decrease the level of our reserves as experience develops or new information becomes known.

*We believe that the liabilities that we have recorded for unpaid losses and loss adjustment expenses are adequate to cover the ultimate net cost of losses and loss adjustment expenses incurred to date. We periodically review our methods of establishing case and IBNR reserves and update our estimates. Our actuarial staff performs quarterly comprehensive reviews of reserves and loss trends. In addition, Ernst & Young LLP, our independent consulting actuary, provides certification of our reserves at each year end.*

50.     The Form 10-K also noted increased losses and claims in Miami, Florida, but attributed such increases to higher incidences of fraud:

In 2003, the frequency and severity trends in the majority of our coverages remained relatively flat on a country-wide basis. We did note an increase in claims frequency in the Florida personal injury protection coverage, which we believe is generally attributable to increased fraud activity in the Miami market. We increased rates for personal injury protection coverages in October 2003 and noted a substantial reduction in new business in this market in November and December. Our special investigations unit is actively challenging those claims believed to be fraudulent. Overall, the gross accident year loss ratio for the Florida automobile book of business increased 1.7 points during 2003.

51.     The Form 10-K was signed and certified by each of the Individual Defendants pursuant to the Securities Exchange Act of 1934.

52.     On March 24, 2004, the Individual Defendants caused the Company to issue a press release entitled "Direct General Corporation Announces Pricing of Secondary Offering." The press release stated in part:

Direct General Corporation today announced that secondary offering of 3,314,015

{003809\05169\00092507.DOC / Ver.1} 17

shares of its common stock by selling shareholders (including the 529,431 additional shares to be registered pursuant to Rule 462(b) as described below) has been priced at $34.25 per share. 1,829,431 shares were sold by the William C. Adair, Jr. Trust and certain family members of Mr. William C. Adair, the founder of the Company, and the remaining shares were sold by certain other individual and institutional shareholders. In addition, the Company has granted the underwriters an option to purchase up to an additional 497,102 shares of common stock (including the 79,414 additional shares to be registered pursuant to Rule 462(b) as described below) to cover over-allotments, if any.

53.     On April 7, 2004, the Individual Defendants caused the Company to issue a press release entitled "Direct General Corporation Announces Closing of Over-Allotment in Secondary Offering." The press release stated in part:

> Direct General Corporation today announced that it had completed the issuance and sale of 497,102 additional shares of common stock of the Company upon the exercise of the over-allotment option that the Company granted to the underwriters of its recent secondary offering. The additional shares will be offered to the public at a price of $34.25 per share. Total proceeds (before expenses) from the secondary offering, including those from the exercise of the over-allotment option, were approximately $124.3 million. Direct General sold all of the shares in, and received approximately $16.2 million of proceeds (before expenses) from, the exercise of the over-allotment option. The Company did not receive any of the proceeds from the sale of shares by the selling shareholders.

54.     On May 10, 2004, the Individual Defendants caused the Company to issue a press release entitled "Direct General Corporation Announces First Quarter Results." The press release stated, in pertinent part, as follows:

> Direct General Corporation today announced first quarter 2004 net income of $15.0 million or $0.67 per share, on a diluted basis. Comparatively, net income for the first quarter of 2003 was $9.8 million or $0.56 per share, on a diluted basis.

> "Our strong first quarter results continue to reflect positive growth trends and the power of our business model," stated William Adair, Direct's Chairman, Chief Executive Officer and President. "We are very pleased with the integration of the Cash Register agency offices that were acquired in the fourth quarter of 2003. During the quarter, these offices produced additional commission and service fee income of $1.6 million, while the conversion of the cost structure from a commission-based structure to the largely fixed cost structure provided by our business model resulted in a $2.6 million decrease in operating costs for the Cash Register business."

\* \* \*

The following table presents our gross premiums written in our major markets and provides a reconciliation of gross revenues (a non-GAAP financial measure) to total revenues, a summary of gross, ceded and net premiums written and earned, and key financial ratios for the periods presented ($ in millions):

| | Three Months Ended March 31 | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | % Change |
| Gross premiums written | | | |
| Florida | $ 83.9 | $ 70.9 | 18.3 |
| Tennessee | 23.4 | 20.9 | 12.0 |
| Georgia | 12.3 | 11.9 | 3.4 |
| Louisiana | 12.5 | 10.5 | 19.0 |
| Mississippi | 10.1 | 8.4 | 20.2 |
| Texas | 7.0 | 1.8 | 288.9 |
| All other states | 19.8 | 16.2 | 22.2 |
| Gross premiums written | $169.0 | $140.6 | 20.2 |

55.     On May 14, 2004, the Individual Defendants caused Direct to file with the SEC its Quarterly Report on Form 10-Q for Q1:04, reiterating the financial and operational statements in the May 10, 2004 press release and providing the following disclosure with respect to "Insurance Losses and Loss Adjustment Expenses":

Insurance losses and loss adjustment expenses increased to $60.8 million for the three months ended March 31, 2004 from $34.8 million for the same period in 2003. Net loss ratios for the first quarter of 2004 and 2003 were 73.3% and 73.0%, respectively. The Company's quarterly analysis of reserves resulted in a slight increase to prior year reserves, which increased the net loss ratio by 0.4 points in the first quarter of 2004. During the first quarter of 2003, the Company recognized $0.8 million of favorable development on prior years' reserves, which reduced the net loss ratio by 1.7 points. The net loss ratios, excluding the impact of the adjustments to prior years' reserves, were 72.9% and 74.7% for the three months ended March 31, 2004 and 2003, respectively. The impact of catastrophic losses in both the first quarter of 2004 and 2003 was minimal.

Overall, our countrywide frequency and severity trends were relatively flat for the current quarter. We have been closely monitoring increases in claims frequency, particularly in the personal injury protection coverage in the Miami, Florida market

over the past few quarters. We increased rates for personal injury protection coverages and have been actively challenging those claims believed to be fraudulent. As a result of these efforts, coupled with a substantial reduction in new business in the Miami, Florida market, we have began to experience an improvement in the loss trends for the personal injury protection coverage in Florida. The loss ratio for our Texas business continues to be slightly better than our countrywide average for our existing states.

56.     The Form 10-Q also included the following Certification signed by defendants W.

Adair and Elkins:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report....

57.     On August 3, 2004, the Individual Defendants caused the Company to issue a press

release entitled "Direct General Corporation Announces Second Quarter Results." The press release

stated, in pertinent part, as follows:

Direct General Corporation today announced second quarter 2004 net income of $16.0 million or $0.70 per share, on a diluted basis. Comparatively, net income for the second quarter of 2003 was $10.1 million, which included the after-tax impact of net realized gains on investments of $1.1 million. Net realized losses on investments were insignificant in the current quarter. Net income for the quarter, excluding net realized gains and losses on investments, increased 76.8% over the corresponding period in 2003.

"We are very pleased with our results for the second quarter of 2004 as our business continues to track in line with our expectations for the year," stated William Adair, Direct's chairman, chief executive officer and president. "Year to date, gross revenues increased 21% and net income increased approximately 56%. We recently began installing our agency systems into some of the independent agency offices in Texas in anticipation of our acquisition of these offices at the end of the year. We are also actively pursuing sales office locations in our expansion states of Missouri and Virginia. In addition to our core business, we remain excited about our additional ancillary income opportunities in the second half of 2004."

*

* *

Net loss ratios, which include both losses and loss adjustment expenses, were 73.2% and 74.7% for the second quarter of 2004 and 2003, respectively. The combined ratio was 75.4% in the second quarter of 2004, as compared to 76.1% for the corresponding period in 2003. During the second quarter of 2004, the Company increased its reserves for prior accident quarters by $0.7 million, which increased the loss and combined ratio by 0.7 points. In comparison, the Company's net loss ratio and combined ratio were increased by approximately 2.2 points of weather related losses and 0.5 points of unfavorable development in the second quarter of 2003.

* * *

The following table presents our gross premiums written in our major markets and provides a reconciliation of gross revenues (a non-GAAP financial measure) to total revenues, a summary of gross, ceded and net premiums written and earned, and key financial ratios for the periods presented ($ in millions):

|  | (Unaudited) Three Months Ended June 30, | | | (Unaudited) Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 2004 | 2003 | % Change | 2004 | 2003 | % Change |
| Gross premiums written |  |  |  |  |  |  |
| Florida | $52.2 | $46.7 | 11.8 | $136.1 | $117.6 | 15.7 |
| Tennessee | 13.6 | 13.2 | 3.0 | 37.0 | 34.1 | 8.5 |
| Georgia | 6.7 | 5.0 | 34.0 | 19.0 | 16.9 | 12.4 |
| Louisiana | 6.1 | 5.8 | 5.2 | 18.6 | 16.3 | 14.1 |
| Texas | 8.0 | 3.6 | 122.2 | 15.0 | 5.4 | 177.8 |
| Mississippi | 5.0 | 4.0 | 25.0 | 15.1 | 12.4 | 21.8 |
| All other states | 10.2 | 9.6 | 6.3 | 30.0 | 25.8 | 16.3 |
| Gross premiums written | $101.8 | $87.9 | 15.8 | $270.8 | $228.5 | 18.5 |

58.     On August 10, 2004, the Individual Defendants caused Direct to file with the SEC its Quarterly Report on Form 10-Q for Q2:04. The Form 10-Q reiterated the financial and operational statements in the August 3, 2004 press release and provided the following disclosure with respect to "Insurance Losses and Loss Adjustment Expenses":

Insurance losses and loss adjustment expenses increased to $68.3 million for the three months ended June 30, 2004 from $40.2 million for the same period in 2003. Net loss ratios for the second quarter of 2004 and 2003 were 73.2% and 74.7%,

respectively. The Company's quarterly analysis of reserves resulted in an increase to the reserves for prior accident quarters of $0.7 million or 0.7 points in the second quarter of 2004. During the quarter, we strengthened prior year reserves, primarily associated with the personal injury protection coverage in Florida, by approximately $2.0 million and reduced reserves associated with accidents occurring in the first quarter of 2004 by approximately $1.3 million due to lower than expected frequency trends for property and physical damage coverages primarily in Florida. In comparison, the loss ratio for the second quarter of 2003 was increased by approximately 2.2 points of weather related losses and by 0.5 points of adverse reserve development. The impact of weather related losses in the second quarter of 2004 was minimal.

For the six months ended June 30, 2004, insurance losses and loss adjustment expenses increased to $129.1 million from $75.0 million in the corresponding 2003 period and the net loss ratios were 73.2% and 73.9%, respectively. Our year to date loss ratio was adversely impacted by approximately 1.3 points due to the strengthening of prior year reserves. The impact of catastrophic losses for the first six months of 2004 was minimal. For the six months ended June 30, 2003, the loss ratio included approximately 1.2 points of weather related losses that were partially offset by 0.5 points of favorable development on prior year's reserves.

Overall, for the first six months of 2004, our countrywide frequency and severity trends were relatively flat for the personal injury protection and property damage coverages as compared to 2003; however, we have seen a slight improvement in the frequency for the bodily injury and physical damage coverages. We have been closely monitoring increases in claims frequency, particularly in the personal injury protection coverage in the Miami, Florida market over the past few quarters. These trends appear to have stabilized and we are starting to see the benefits from the rate increases that we implemented in October 2003 and May 2004. The loss ratio for our Texas business continues to be slightly better than our countrywide average for our existing states.

     59.     The Form 10-Q also included the following Certification signed defendant W. Adair

and Elkins:

     2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

     3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report ....

60.     On November 1, 2004, the Individual Defendants caused the Company to issue a

press release entitled "Direct General Corporation Announces Third Quarter Results." The press

release stated, in pertinent part, as follows:

> Direct General Corporation today announced third quarter 2004 net income of $14.3
> million or $0.63 per share, on a diluted basis. Comparatively, net income for the
> third quarter of 2003 was $11.7 million or $0.58 per diluted share, which included
> net realized gains on investments of approximately $0.05 per share.

* * *

> William Adair, Chairman, CEO and President stated, "The past few months have
> been extremely difficult for all of the residents in Florida as a result of the four
> significant hurricanes that impacted almost every region of the entire state. I am very
> proud of the efforts of our claims staff who have been working closely with our
> insureds to quickly settle all claims. While these storms adversely impacted our
> financial results for the quarter, I believe they also highlighted the true strength of
> our Company. Despite this highly unusual level of hurricane activity in Florida,
> which represents nearly 50% of our business, we were able to increase net income,
> excluding net realized gains on investments, by approximately 33% over the prior
> year quarter."

* * *

> Net loss ratios, which include both losses and loss adjustment expenses, were 73.7%
> and 74.0% for the third quarter of 2004 and 2003, respectively. The combined ratio
> was 79.9% in the third quarter of 2004, as compared to 74.8% for the corresponding
> period in 2003. Catastrophe losses for the current quarter were approximately $2.3
> million, which increased the loss and combined ratios by approximately 2.4 points in
> the quarter. During both the third quarters of 2004 and 2003, the Company increased
> its reserves for prior accident quarters, which increased the loss and combined ratios
> by approximately 0.9 points and 0.4 points, respectively.

* * *

> The following table presents our gross premiums written in our major markets and
> provides a reconciliation of gross revenues (a non-GAAP financial measure) to total
> revenues, a summary of gross, ceded and net premiums written and earned, and key
> financial ratios for the periods presented ($ in millions):

(Unaudited)
Three Months Ended
September 30,
-----------------------------------------

|                        | 2004   | 2003   | % Change |
|------------------------|--------|--------|----------|
| Gross premiums written |        |        |          |
| Florida                | $53.2  | $53.3  | (0.2)    |
| Tennessee              | 14.6   | 15.0   | (2.7)    |
| Georgia                | 6.7    | 7.3    | (8.2)    |
| Louisiana              | 7.6    | 7.3    | (8.2)    |
| Texas                  | 7.8    | 4.7    | 66.0     |
| Mississippi            | 5.0    | 4.8    | 4.2      |
| All other states       | 12.0   | 10.9   | 10.1     |
| Gross premiums written | $106.9 | $103.7 | 3.1      |

61.     On November 5, 2004, the Individual Defendants caused Direct to file with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, reiterating the financial and operational statements in the November 1, 2004 press release and providing the following disclosure with respect to "Insurance Losses and Loss Adjustment Expenses":

Insurance losses and loss adjustment expenses increased to $71.8 million for the three months ended September 30, 2004 from $43.2 million for the same period in 2003. Net loss ratios for the third quarter of 2004 and 2003 were 73.7% and 74.0%, respectively. During the quarter, we recognized catastrophe losses totaling $2.3 million associated with the four hurricanes that struck Florida and the Southeastern United States. The impact of weather related losses in the third quarter of 2003 was minimal. The Company's quarterly analysis of reserves resulted in an increase to the reserves for prior accident quarters of $0.9 million or 0.9 points in the third quarter of 2004, which was primarily associated with the personal injury protection coverage in Florida. In comparison, the loss ratio for the third quarter of 2003 was increased by approximately 0.4 points of adverse reserve development.

For the nine months ended September 30, 2004, insurance losses and loss adjustment expenses increased to $200.9 million from $118.2 million in the corresponding 2003 period and the net loss ratios were 73.4% and 73.9%, respectively. The impact of weather related losses in both the first nine months of 2004 and 2003 was approximately 0.8 points on the respective loss ratios. Our 2004 year to date loss ratio was adversely impacted by approximately 1.5 points due to the strengthening of prior year reserves. The majority of this strengthening centered on an increase in the frequency and severity trends for the personal injury protection coverage, particularly in the Miami, Florida market, where we continue to experience high levels of fraudulent activity. For the nine months ended September 30, 2003, the loss ratio included approximately 0.2 points of favorable development on prior year's reserves. The accident year loss ratio, which excludes the impact of prior year reserve development, improved to 71.9% in 2004 from 74.1% in 2003, primarily as a

result of a modestly higher level of premiums earned per exposure on both the personal injury protection and physical damage coverages. Overall, we have seen a small improvement in severity trends that were partially offset by a minor increase in claims frequency.

Over the past several quarters, we adjusted premium rates and increased the involvement of our special investigations unit in an attempt to combat the continued fraud problems in the Miami market, which represents approximately 5% of our total Florida premium volume. While the rate increases we implemented have resulted in a reduction in exposures in this market, we are still not satisfied with the level of losses on new business. As a result, our sales offices in the Miami market are no longer accepting applications for new business. We will, however, continue to service our profitable renewal book of business out of these offices.

62.     The Form 10-Q also included the following Certification signed by defendants W.

Adair and Elkins:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report ....

63.     On November 9, 2004, Direct announced that "Jacqueline C. Adair, Executive Vice

President and Chief Operating Officer of the Company, Tammy R. Adair, Executive Vice President

of the Company and the William C. Adair, Jr. Trust (Tammy Adair as Trustee) (together with

William C. Adair, Jr. referred to below as the 'Adair Family'), have sold 400,000 shares of Direct in

compliance with Rule 144 of the Securities Act of 1933."

## THE TRUTH EMERGES

64.     In fact, Direct's financial statements and disclosures throughout the Relevant Period

were materially false and misleading and grossly inflated in that Direct was failing to properly adjust

for loss reserves with respect to a change in the law related to the personal injury protection

coverage in Florida. Beginning with policies issued on or after October 1, 2003, Florida mandated

that the maximum personal injury protection coverage deductible be reduced from $2,000 per

occurrence to $1,000 and that the limit be increased to $10,000 in excess of the deductible as

opposed to $10,000 less the deductible.

65.    On January 26, 2005, after the close of trading, Direct shocked the investing public

when the Individual Defendants caused the Company to issue a press release entitled "Direct

General Corporation Announces Impact of Reserve Analysis and Previews Fourth Quarter,"

announcing that it would be adjusting its loss reserves and changing its reserve analysis. The press

release stated, in pertinent part, as follows:

> Direct General Corporation today announced that it has completed its analysis of loss
> reserves as of December 31, 2004, and has determined that it is necessary to
> strengthen its loss reserves for an estimated 2.1 point increase in the expected
> ultimate loss ratio for the 2004 accident year and to further increase its reserves for
> prior accident years by approximately $2.2 million. The total effect of the reserve
> strengthening is expected to result in a reduction in net income, after taxes, of
> approximately $7.1 million or $0.31 per diluted share for the fourth quarter of 2004.

> The majority of the increase in reserves is attributable to the impact of a law change
> related to the personal injury protection coverage in Florida. Beginning with policies
> issued on or after October 1, 2003, Florida mandated that the maximum personal
> injury protection coverage deductible be reduced from $2,000 per occurrence to
> $1,000 and that the limit be increased to $10,000 in excess of the deductible as
> opposed to $10,000 less the deductible. The Company has determined that it is
> prudent to increase its loss reserves as additional frequency and severity trend data
> have continued to emerge related to losses on these policies. The Company has also
> continued to experience adverse development associated with the business in the
> Miami/Dade County market where, as previously announced, the Company ceased
> issuing new policies in October 2004 due to that market's high level of fraudulent
> activity.

> In addition, the Company has experienced an increase in frequency on bodily injury
> claims in Tennessee that was elevated by an increase in the number of claimants on
> each reported claim.

66.    Investor reaction was quick and negative with Direct stock losing more than 31% on

January 27, 2005 on heavy trading volume.

## INDIVIDUAL DEFENDANTS OFFER TO BUY BACK OUTSTANDING
## COMPANY SECURITIES IN ORDER TO PROTECT THEMSELVES

67.     On January 31, 2005, the Individual Defendants caused the Company to issue the

following press release, entitled "Direct General Corporation Announces $20 Million Share

Repurchase." In a move clearly orchestrated to bolster the Company's stock price and enhance the

value of the Individual Defendants' remaining stock options, Direct announced that it was initiating

a massive $20 million buy-back of its outstanding securities. The press release stated, in pertinent

part, as follows:

> Direct General Corporation today announced that its Board of Directors approved the
> repurchase of up to $20 million of its outstanding common stock. The shares may be
> repurchased in accordance with Rule 10b-18 under the Securities Exchange Act of
> 1934 and is expected to commence after February 11, 2005 and continue over the
> next 12 months. At its earliest opportunity, the Company intends to adopt a formal
> 10b5-1 purchase plan to implement the repurchase program. The Company expects
> to develop the purchase plan considering a variety of factors, including potential
> stock acquisition price, cash requirements, acquisition opportunities, strategic
> investments and other market and economic factors.

> "The Board of Directors' authorization to repurchase shares reflects confidence in
> our future and our prospects for continued growth, and a belief that, at current market
> prices, Direct shares are undervalued, representing an attractive investment for the
> Company and our shareholders," said William C. Adair, Jr., Chairman, President and
> Chief Executive Officer. "We believe that the combination of the Company's current
> strong balance sheet position and expected future cash flows should permit us to
> execute this program while enabling us to maintain sufficient levels of capital to
> support our growth and pursue additional acquisition opportunities. We anticipate
> that this repurchase program will add long-term value to our shareholders and is
> expected to be accretive to earnings per common share."

## IMPROPER FINANCIAL REPORTING
## DURING THE RELEVANT PERIOD

68.     In order to falsely inflate its financial results during the Relevant Period, defendants

caused Direct to violate Generally Accepted Accounting Principles ("GAAP") and SEC rules by,

among others and without limitation, failing to properly adjust for loss reserves with respect to a

change in the law related to the personal injury protection coverage in Florida for policies issued on

or after October 1, 2003.

69.     Direct included its false and incorrect financial statements and results in press releases and in its quarterly and annual reports. These SEC filings represented that the financial information presented therein was a fair statement of Direct's financial results and that the results were prepared in accordance with GAAP.

70.     These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Direct's operations, causing the financial results to be presented in violation of GAAP and SEC rules.

71.     Regulation S-X [17 C.F.R. '210.4-01(a)(1)] states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual financial statements.

72.     Due to these accounting improprieties, Direct presented its financial results in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(c)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and the public in general (FASB Statements of Concepts No. 1, ¶50);

(d)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

73.     Further, the undisclosed adverse information concealed by defendants during the

Relevant Period is the type of information which because of SEC regulations, regulations of the national stock exchanges and customary business practices, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

74.     As a result of the Individual Defendants' actions, Direct's market capitalization has been damaged by over $270 million.  At the same time that the defendants were causing Direct to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $81.7 million of their personally held stock.

## ILLEGAL INSIDER SELLING

75.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Direct stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Jacqueline C. Adair | 11/8/2004 | 40000 | $ 29.62 | $ 1,184,800.00 |
| | 3/23/2004 | 140000 | $ 34.25 | $ 4,795,000.00 |
| | | **180000** | | **$ 5,979,800.00** |
| Barry D. Elkins | 3/23/2004 | 84240 | $ 34.25 | $ 2,885,220.00 |
| | 3/23/2004 | 59760 | $ 34.25 | $ 2,046,780.00 |
| | | **144000** | | **$ 4,932,000.00** |
| Tammy R. Adair | 11/8/2004 | 40000 | $ 29.62 | $ 1,184,800.00 |
| | 11/8/2004 | 320000 | $ 29.62 | $ 9,478,400.00 |
| | 3/23/2004 | 60000 | $ 34.25 | $ 2,055,000.00 |
| | 3/23/2004 | 1629431 | $ 34.25 | $55,808,011.75 |
| | | **2049431** | | **$68,526,211.75** |
| Raymond L. Osterhout | 11/4/2004 | 5000 | $ 29.80 | $    149,000.00 |
| | 8/6/2004 | 13262 | $ 30.16 | $    399,981.92 |
| | 8/6/2004 | 3979 | $ 30.16 | $    120,006.64 |
| | 3/23/2004 | 10000 | $ 34.25 | $    342,500.00 |
| | | **32241** | | **$ 1,011,488.56** |
| Ronald F. Wilson | 1/27/2005 | 6000 | $ 21.78 | $    130,680.00 |
| | 7/13/2004 | 2000 | $ 30.29 | $     60,580.00 |
| | 7/6/2004 | 2000 | $ 30.45 | $     60,900.00 |
| | 6/29/2004 | 2000 | $ 32.56 | $     65,120.00 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 6/22/2004 | 2000 | $ 32.80 | $ 65,600.00 |
| | 6/15/2004 | 2000 | $ 32.94 | $ 65,880.00 |
| | 6/8/2004 | 2000 | $ 35.78 | $ 71,560.00 |
| | 5/18/2004 | 2000 | $ 34.86 | $ 69,720.00 |
| | 5/11/2004 | 2000 | $ 35.34 | $ 70,680.00 |
| | 5/4/2004 | 2000 | $ 36.15 | $ 72,300.00 |
| | 4/27/2004 | 2000 | $ 35.65 | $ 71,300.00 |
| | 4/20/2004 | 2000 | $ 36.25 | $ 72,500.00 |
| | | **28000** | | $ **876,820.00** |
| William J. Harter | 3/23/2004 | **12000** | **$ 34.25** | $ **420,480.00** |
| **Total:** | | **2,445,672** | | **$81,746,800.31** |

## THE INDIVIDUAL DEFENDANTS' AGREE TO THE UNFAIR MERGER IN ORDER TO ELIMINATE THEIR PERSONAL LIABILITY FOR THEIR BREACHES DETAILED HEREIN AND TO GAIN LUCRATIVE BENEFITS NOT SHARED BY SHAREHOLDERS

76.     The Individual Defendants sought a buyer willing to discharge the Individual Defendants' liability for the breaches of fiduciary duties detailed herein.

77.     On December 5, 2006, the Company announced that it had entered into a merger agreement valued at approximately $628 million, including debt, with Elara Holdings, Inc., (an affiliate of Fremont Partners) and Texas Pacific Group (collectively the "Merger Group"). This amounts to $21.25 per share. As part of the deal, two members of the Company's founding Adair family will step down from senior management. The transaction is structured as a merger whereby the Company will be merged into Elara Merger Corporation, a merger subsidiary of Elara Holdings, Inc. (the "Merger").

78.     The proposed Merger was approved by a special committee of the Board (the "Special Committee") which had been established to analyze and make recommendations regarding strategic options for the Company. The Special Committee was comprised of Individual Defendants Medling, Osterhout and Rohde.

79.     The $21.25 per share offered in the Merger is an unfair price that is the result of an unfair process. First, the Special Committee that evaluated and recommended approval of the Merger was flawed and not designed to replicate arm's length negotiations with the Merger Group as there are no directors of the Company who are not personally implicated in the wrongdoing detailed herein. There are no directors who do not suffer from disabling conflicts who could have impartially evaluated the Merger. Second, the price contemplated in the Merger is unfair because it provides for disparate and superior consideration to the Individual Defendants. The Individual Defendants are personally liable for the damages caused by their unlawful acts. The Merger has been formulated and agreed to by the Individual Defendants to sell the Company and discharge the Individual Defendants' personal liability. The Individual Defendants, in addition to receiving $21.25 cash per share, are receiving a discharge of their personal indebtedness to the Company for the breaches of fiduciary duties detailed herein. That personal indebtedness of the Individual Defendants adds value to Direct that is not reflected in the $21.25 cash per share offer.

80.     The terms of the Merger Agreement are also structured to ensure that the Merger Group and only the Merger Group, ultimately acquires the Company, regardless of whether such terms are designed and/or serve to maximize shareholder value. For example, the Merger Agreement contains a "no-shop" provision which states the Company shall not, among other things: solicit, initiate, encourage, facilitate or induce any inquiry with respect to, or the making, submission or announcement of, any other proposal; participate or engage in any discussions or negotiations regarding, or furnish to any person any nonpublic information with respect to, or take any other action to facilitate or encourage any inquiries or the making of any proposal that constitutes or could reasonably be expected to lead to, any other proposal; approve, endorse, recommend or make or authorize any statement, recommendation or solicitation in support of any other proposal.

81.     The Merger Agreement also provides that if the Company Board approves and authorizes the Company to enter into a definitive agreement providing for the implementation of another acquisition proposal, the Company would have to pay a $13 million termination fee to the Merger Group.

82.     Rather than obtain the best possible deal for Direct General's shareholders and maximize the value of the Company's shares, the Individual Defendants tailored the Merger Agreement so that they could enjoy undeserved change in control benefits, including the immediate vesting of unvested options held by defendants. The vesting of those options will entitle the Individual Defendants to the profitable difference between the options' exercise prices and the $21.25 per share that the Merger Group is offering for the Company. The Individual Defendants will gain that compensation whether or not the option is vested. Further defendants W. Adair and J. Adair will receive windfall monetary and fringe benefits by operation of Employment Agreements that these spouses negotiated and approved for their own and each others' benefit as directors and officers of Direct, and by operation of amendments to the Employment Agreements that these defendants negotiated for themselves and each other as part of the Merger Agreement and related agreements. Additionally, Individual Defendant T. Adair, daughter of W. Adair and Stepdaughter of J. Adair, will benefit from an unwarranted and lucrative employment agreement that will enrich her at the expense of the Company's stockholders.

83.     On January 4, 2007, the Individual Defendants caused the Company to distribute to shareholders a proxy statement in connection with the shareholder vote on the Merger (the "Merger Proxy Statement"). The Merger Proxy Statement was false and misleading in that:

                (a)     It fails to disclose to shareholders that the Special Committee could not fairly and impartially make recommendations regarding the Merger because all the Special Committee

members will be discharged from personal liability for the derivative claims alleged herein as a result of the consummation of the Merger;

(b)     it fails to disclose that the Merger consideration does not account for the potential monetary recovery by Company on the derivative claims alleged herein, or the possible extinguishment of the derivative claims by virtue of consummation of the Merger;

(c)     it fails to disclose the identity of each party that expressed an interest in purchasing or merging with Direct;

(d)     it fails to adequately disclose the assumptions and analyses contained in the fairness opinion included in Merger Proxy Statement, rendered by the Special Committee's financial advisor, SunTrust Robinson Humphrey.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.     Plaintiff brings this action derivatively in the right and for the benefit of Direct to redress injuries suffered, and to be suffered, by Direct as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Direct is named as a nominal defendant solely in a derivative capacity. This is not a collusive action designed to confer jurisdiction on this Court that it would not otherwise have.

85.     Plaintiff will adequately and fairly represent the interests of Direct in enforcing and prosecuting its rights.

86.     Plaintiff is and was an owner of the stock of Direct during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

87.     The current Board of Directors of Direct consists of the following five individuals:

defendants W. Adair, J. Adair, Medling, Osterhout, and Rohde. Plaintiff has not made any demand on the present Board of Directors of Direct to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current members of the Direct Board participated in the illegal insider selling:

(i)     During the Relevant Period, J. Adair sold 180,000 shares of Direct stock for proceeds of $5,979,800.00; and

(ii)     During the Relevant Period, Osterhout sold 32,241 shares of Direct stock for proceeds of $1,011,488.56. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested and any demand upon them is futile.

(b)     Defendants W. Adair and J. Adair dominate and control the Company and the entire Board. Defendant W. Adair founded the Company in 1991 and since that time has served as Chairman of the Board. Defendant J. Adair, W. Adair's wife, has served in various top executive positions including President, Executive Vice President and Chief Operating Officer since 1996. Further, as of March 29, 2004, the Adair Family controlled over 50.35% of the Company's stock. As a result, over half of the Company is under the direction and control of the Adair Family. Thus, demand on defendants Medling, Osterhout and Rohde is futile as these defendants are dominated and controlled by defendants W. Adair and J. Adair. Because of their control over Direct, W. Adair

and J. Adair have caused the Company to do the following:

       (i)     In October 2001, defendants W. Adair and J. Adair caused Direct General Insurance Agency, Inc., one of Direct's subsidiaries, to purchase certain real property in which W. Adair and J. Adair jointly owned an interest for approximately $0.1 million. Prior to the purchase, the subsidiary company leased this property and paid aggregate rentals of $29,400;

       (ii)    In 2001 and 2002, defendants W. Adair and J. Adair caused several of Direct's subsidiaries to pay an aggregate of approximately $1.4 million and $1.5 million, respectively, for various legal services, to an association of lawyers in which defendant T. Adair held an ownership interest. In addition, during these years, this association of lawyers collected $4.1 million and $3.8 million, of which sums it retained $1.4 million and $1.3 million. Also, Direct Administration, Inc., one of Direct's subsidiaries, leased property to this association of lawyers over the same period for an aggregate of $15,500 and $16,250 in 2002 and 2001, respectively;

       (iii)   In 2002 and 2003, defendants W. Adair and J. Adair caused Direct Administration, Inc. and Direct Adjusting Company, Inc., two of Direct's subsidiaries, to pay an aggregate of approximately $69,460 and $63,000, respectively, to Kerry Taylor for janitorial services. Ms. Taylor is the daughter of defendants W. Adair, step-daughter of defendant J. Adair and sister of defendant T. Adair;

       (iv)   In 2001, defendants W. Adair and J. Adair caused several of Direct's subsidiaries to sell salvaged vehicles to Frank Millington, the husband of defendant T. Adair, for an aggregate amount of approximately $61,000;

       (v)    In 2001, 2002 and 2003, defendants W. Adair and J. Adair caused two of Direct's subsidiaries to pay Mid-South Collision, LLC approximately $0.9 million, $0.8 million, and $0.7 million, respectively, for auto body work. Mid-South Collision, LLC is owned by the

step-daughter and stepson-in-law of defendant T. Adair; and

        (vi)    In September 2002, defendants W. Adair and J. Adair caused the Company to appoint their own daughter, defendant T. Adair, to the position of Executive Vice President. In FY:03, T. Adair received over $272,906 in salary, bonus and other compensation and received 90,000 options to purchase direct stock.

        (c)    The Board of Directors initiated a shelf-registration offering to the public on March 23, 2004, for common stock owned by certain named defendants, namely defendants J. Adair, T. Adair, Elkins, and Osterhout, for the sole purpose of allowing these Defendants, who possessed knowledge of material adverse information as detailed herein about the Company's financial health, to dump their personally-held Company stock onto an unsuspecting public and minimize their overall holdings in Company securities. By initiating such an offering while possessing material adverse information about the Company's financial condition, the Board of Directors exposed the Company and individuals responsible for the shelf-registration offering to the strict liability imposed by the Securities Act of 1933. Due to the imposition of strict liability under the 1933 Act, each member of the Board of Directors bears liability in connection with the shelf-registration offering and cannot impartially consider a demand to bring this lawsuit, as it would further expose their own involvement in the alleged wrongdoing.

        (d)    On January 31, 2005, the Director Defendants caused the Company to announce the implementation of a $20 million stock buy-back program. The Director Defendants instituted the buy-back in an effort to both reduce their personal liability in any shareholder lawsuits and help bolster the price of Company securities and reverse the devaluation of their options so that the Director Defendants may continue to sell personally-held stock for large proceeds. The Company gains nothing through the buy-back plan implemented by the Director Defendants, but

rather is harmed by the removal of $20 million dollars from cash that could be used to defend the Company against lawsuits arising out of the directors' misconduct and/or to resolve these same lawsuits. Instead, the Director Defendants, who own in excess of 25% of the stock of the Company, are using this buy-back to increase the value of their remaining shares and options at the expense of the Company.

(e)     The Compensation Committee of the Board establishes the compensation arrangements for members of the Board of Directors and senior management. These arrangements include overseeing Direct's equity incentive plans in which officers and directors are eligible to participate and granting stock options or other benefits under such plans.     The Compensation Committee is comprised of defendants Osterhout and Medling.     As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Osterhout and Medling. To do so would jeopardize each defendant's personal financial compensation.     Thus, demand on defendants W. Adair, J. Adair and Rohde is futile.

(f)     The principal professional occupation of defendant W. Adair is his employment with Direct, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.     Specifically, for FY:03, Direct paid defendant W. Adair $726,934 in salary, bonus and other compensation, and granted him 300,000 options to purchase Direct stock.     Accordingly, defendant W. Adair lacks independence from defendants Osterhout and Medling, defendants who are not disinterested and/or independent and who exert influence over defendant W. Adair's compensation by virtue of their positions as members of the Compensation Committee.     This lack of independence renders defendant W. Adair incapable of impartially considering a demand to commence and vigorously prosecute this action.

(g)     The principal professional occupation of defendant J. Adair is her employment with Direct, pursuant to which she received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:03, Direct paid defendant J. Adair $359,503, in salary, bonus and other compensation, and granted her 240,000, options to purchase Direct stock. Accordingly, defendant J. Adair lacks independence from defendants Osterhout and Medling, defendants who are not disinterested and/or independent and who exert influence over defendant J. Adair's compensation by virtue of their positions as members of the Compensation Committee. This lack of independence renders defendant J. Adair incapable of impartially considering a demand to commence and vigorously prosecute this action.

(h)     Defendants Osterhout, Medling and Rohde, as non-employee directors of the Company, each receive $20,000 annually. Further, these defendants receive an additional $1,500 annually for each committee on which they serve. Defendant Rohde, as the chairman of the Audit Committee, receives an additional $5,000 annually. Accordingly, demand that these defendants institute this action against the remainder of the defendants is futile as these defendants have an interest in safeguarding their substantial compensation.

(i)     According to Direct's Proxy Statement filed with the SEC on or about April 7, 2004, defendants Medling, Osterhout and Rohde were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible by its own charter for reviewing and discussing with management the Company's quarterly financial statements, prior to the filing of the Company's quarterly report on Form 10-Q; discussing with management any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls, and

any special steps adopted in light of material internal control deficiencies or weaknesses; reviewing and discussing with management all critical accounting policies and practices to be used; discussing with management the Company's disclosure controls and procedures and its internal controls and procedures for financial reporting, including the conclusions of the Company's CEO and chief financial officer regarding the effectiveness of both sets of controls and procedures reached as part of their certification process for the quarterly report on Form 10-Q and the annual report on Form 10-K; discussing the Company's earnings press releases and earnings guidance with management; and discussing with management other financial information that the Company provides to securities analysts, credit rating agencies, and others. Nonetheless, the Audit Committee recommended that the Board of Directors include the improper audited consolidated financial statements described herein that were disseminated to the public and filed with the SEC. Defendant Rohde bears particular responsibility for such wrongdoing, as he is designated as the Company's financial expert. By such actions, defendants Medling, Osterhout and Rohde breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breaches of their duties, any demand upon them is futile.

(j) The entire Direct Board of Directors and senior management participated in the wrongs complained of herein. Direct's directors are not disinterested or independent due to the following: defendants W. Adair, J. Adair, Medling, Osterhout, and Rohde served on the Direct Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Direct and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Direct Board cannot exercise independent objective judgment in deciding whether to bring this action or

whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Direct to millions of dollars in liability for possible violations of applicable securities laws.

(k)     The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     *W. Adair and J. Adair Are Married:* Because of their long-standing and entangling personal relationship, neither defendant W. Adair nor defendant J. Adair will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants; and

(ii)     *T. Adair Is the Daughter of W. Adair and Step-Daughter of J. Adair:* Because of their long-standing and entangling personal relationship, neither defendant W. Adair nor defendant J. Adair will take the action requested by plaintiff herein against defendant T. Adair or the remainder of the Individual Defendants.

(l)     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

(m)     The defendant directors of Direct, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Direct's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

(n)     In order to bring this suit, all of the directors of Direct would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

(o)     The acts complained of constitute violations of the fiduciary duties owed by Direct's officers and directors and these acts are incapable of ratification.

(p)     Each of the defendant directors of Direct authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

(q)     Any suit by the current directors of Direct to remedy these wrongs would likely expose the Individual Defendants to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(r)     Direct has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Direct any part of the damages Direct suffered and will suffer thereby.

(s)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair

{003809\05169\00092507.DOC / Ver.1}42

their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

(t)     If Direct's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Direct. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Direct against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Direct, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Direct to sue them, since they will face a large uninsured liability.

88.     Moreover, despite the Individual Defendants having knowledge of the claims raised by plaintiff, the current Board of Directors has failed and refused to seek to recover for Direct for any of the wrongdoing alleged by plaintiff herein.

89.     Plaintiff has not made any demand on shareholders of Direct to institute this action

since such demand would be futile and useless act for the following reasons:

> (a)    Direct is a publicly traded company with approximately 22 million shares outstanding, and thousands of shareholders;

> (b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

> (c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## FIRST CLAIM FOR RELIEF

### Derivatively on Behalf of Direct Against the Insider Selling Defendants
### for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

90.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Direct common stock on the basis of such information.

92.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Direct common stock.

93.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Direct common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

94.    Since the use of the Company's proprietary information for their own gain constitutes

a

breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## SECOND CLAIM FOR RELIEF

### Derivatively on Behalf of Direct Against All
### Individual Defendants for Breach of Fiduciary Duty

95.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.    The Individual Defendants owed and owe Direct fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Direct the highest obligation of good faith, fair dealing, loyalty and due care.

97.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

98.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Direct has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

100.    Plaintiff on behalf of Direct has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Derivatively on Behalf of Direct Against All Individual Defendants for Abuse of Control

101.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

102.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Direct, for which they are legally responsible.

103.     As a direct and proximate result of the Individual Defendants' abuse of control, Direct has sustained significant damages.

104.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

105.     Plaintiff on behalf of Direct has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF

#### Derivatively on Behalf of Direct Against All Individual Defendants for Gross Mismanagement

106.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Direct in a manner consistent with the operations of a publicly held corporation.

108.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Direct has sustained significant damages in excess of hundreds of millions of dollars.

109.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

110.     Plaintiff on behalf of Direct has no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF

{003809\05169\00092507.DOC / Ver.1}46

**Derivatively on Behalf of Direct Against All Individual Defendants
for Waste of Corporate Assets**

111.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Direct to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

113.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

114.     Plaintiff on behalf of Direct has no adequate remedy at law.

## SIXTH CLAIM FOR RELIEF

### Derivatively on Behalf of Direct Against All Individual
### Defendants for Unjust Enrichment

115.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Direct.

117.     Plaintiff, as a shareholder and representative of Direct, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## SEVENTH CLAIM FOR RELIEF

### On Behalf of Plaintiff and the Class Against the Individual Defendants for Violation of

**Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

118.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.     This Count is brought pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, on behalf of all Class members.

120.     The Individual Defendants caused to be issued the Merger Proxy Statement (which contained solicitations of Proxies) which was distributed to Direct shareholders.

121.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

122.     The Merger Proxy Statement is materially false and misleading because it omits material facts which would allow shareholders to adequately determine whether or not to vote in favor of the Merger, as set forth in paragraph 82 above.

123.     In the exercise of reasonable care, Individual Defendants should have known that the Merger Proxy Statement was materially misleading.

124.     Unless Class members receive injunctive relief, Direct shareholders will be damaged as a result of the material misrepresentations and omissions in the Merger Proxy Statement and are therefore entitled to equitable relief and compensatory damages.

### EIGHTH CLAIM FOR RELIEF

### On Behalf of Plaintiff and the Class Against the Individual Defendants

### for Breach of Fiduciary Duty

125. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126. The Individual Defendants, as directors and/or officers of Direct, owe a duty of undivided loyalty to Direct shareholders.

127. The initiation and timing of the Merger are a breach of the Individual Defendants' duty of loyalty and constitute unfair dealing. The Individual Defendants have failed to provide any effective protection for the Class, as each of the Director Defendants suffer from disabling conflicts of interest that makes it impossible for the Special Committee to render an independent decision that protects the interests of shareholders.

128. The disclosure of the Merger also reflects unfair dealing and lack of candor. The Individual Defendants have caused materially misleading and incomplete information to be disseminated to Direct shareholders, as set forth in paragraph 82 above. The Merger Proxy Statement contains Direct's statements concerning the fairness of the Merger, for example, which are literally false and designed by the Individual Defendants to ensure that shareholders approve the Merger.

129. Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF AS TO COUNTS ONE TO SIX

WHEREFORE, plaintiff derivatively on behalf of Direct demands judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Direct has an effective remedy;

C.      Awarding to Direct restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### PRAYER FOR RELIEF AS TO COUNTS SEVEN AND EIGHT

WHEREFORE, plaintiff, on behalf of himself and on behalf of the Class, demands judgment as follows:

F.      Declaring this action to be a proper class action and certifying plaintiff as class representative and plaintiff's counsel as class counsel;

G.      Preliminarily and permanently enjoining defendants from disenfranchising the Class and effectuating the Merger, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders and fully and fairly informs shareholders regarding the Merger prior to the shareholder vote;

H.      Declaring that the Individual Defendants have breached their fiduciary duty to plaintiff and the Class;

I.      Declaring the Merger void and ordering rescission if consummated;

J.      Requiring defendants to account for all shares, money and other value improperly received from Direct;

K.      Requiring disgorgement and imposing a constructive trust on all property and profits defendants received as a result of their wrongful conduct;

L. Award punitive damages;

M. Award costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs and expenses;

N. Empanel a jury to decide questions of fact and damages; and

O. Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

**Branstetter, Stranch, & Jennings, PLLC**

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV
227 Second Avenue North, 4th Floor
Nashville, TN 37201-1631
Telephone: 615-254-8801
Facsimile: 615-255-5419

*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date, a copy of the foregoing Motion to Amend the Complaint was electronically filed with the Clerk of the Court and thus served on counsel listed below.

Dated this 7th day of February, 2007.

Matthew Sweeney
April Berman
Baker Donalson Bearman & Caldwell
Commerce Center, Suite 1000
211 Commerce St.
Nashville, Tennessee 37201

Peter Q. Bassett
Scott P. Hilsen
Leah Poynter
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309

Nadeem Faruqi
Faruqi and Faruqi
320 East 39th Street
New York, NY 10016

Brian Robbins
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101-3350

_/s/ J. Gerard Stranch, IV_____
J. Gerard Stranch, IV